USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _02/28/2017____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                           :

LGC HOLDINGS, INC.,               :

                           :

                Petitioner,     :         16-CV-5294 (JMF)

                           :         16-CV-5352 (JMF)

        -v-               :

                           :     OPINION AND ORDER

JULIUS KLEIN DIAMONDS, LLC, et al.,   :

                           :

            Respondents.    :

                           :

----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       In these consolidated cases, one of which was filed here and one of which was removed

here from New York state court, Petitioner LGC USA Holdings ("LGC" or "Petitioner") seeks to

confirm the results of bitterly contested arbitration proceedings with its former partners in the

international diamond business and related entities, Respondents Julius Klein Diamonds, LLC

("JKD"); Julius Klein Group Holdings, LLC; Julius Klein Diamonds, Inc.; Klein Tenancy; KLG

Jewelry LLC ("KLG"); Sunrise Venture LLC ("Sunrise"); Martin Klein; Moishe Klein; Malka

Klein; and Abraham David Klein (collectively, the "Kleins" or "Respondents").  Not

surprisingly, the Kleins oppose LGC at every turn: They argue that the cases should be dismissed

for lack of subject-matter jurisdiction; failing that, that the removed case should be remanded

back to state court and the remaining federal case dismissed on abstention grounds; and, failing

that, that the arbitration award should be vacated because, among other things, the arbitrators

were partial, corrupt, and acted in manifest disregard of the parties' agreements and the law.

       The Kleins' attacks on the arbitration award are far from frivolous.  They make troubling

allegations about, among other things, undisclosed connections between the putatively neutral

arbitrator and both LGC's chosen arbitrator and LGC itself, not to mention the neutral arbitrator's failure to disclose criminal charges that resulted in his conviction during the arbitration proceedings.  If the Court were reviewing the award *de novo* or deciding the parties' disputes in the first instance, the Kleins' allegations might well warrant a different result.  But the Court is required to give substantial deference to the arbitrators and to carefully parse whether the Kleins' attacks on the award are legitimate gripes or after-the-fact complaints of losing parties.  In light of those considerations and a close review of the record, the Court concludes that the Kleins' challenges fall short: that the Court has subject-matter jurisdiction; that the state case was properly removed to this Court; and that the Kleins either waived their challenges to the neutral arbitrator or have failed to present sufficient cognizable evidence to support vacatur.  Accordingly, and for the reasons stated below, the Court confirms the arbitration award and denies the Kleins' motions to dismiss, remand, and vacate.

## BACKGROUND

LGC, which is incorporated in Delaware and headquartered in New York, is part of an international diamond business owned by Lev Leviev.  (16-CV-5294, Docket No. 25 ("LGC Pet.") ¶ 2).  Respondents are "individuals or companies affiliated with a diamond business controlled by" Respondent Martin Klein.  (*Id.* ¶ 3).  In 2002, LGC and the Kleins agreed to become "joint venture partners" in three diamond businesses: JKD, KLG, and Sunrise.  (*Id.* ¶ 10).  To simplify the process of unwinding their joint ventures if or when the need arose, the parties agreed — at least with respect to JKD — to establish a valuation each year that would serve as "the basis for determining the buyout" price; if the parties could not agree on a buyout price, they would use "the most recent valuation."  (16-CV-5294, Docket No. 27 ("Leviev Aff.") Ex. 13 ¶ 1 (establishing the buyout procedures for JKD); Leviev Reply Aff. Ex. 3, at 1728-29

2

(Martin Klein testimony that the valuation and unwinding procedures set forth in the JKD agreement applied to all three joint ventures)).  The parties further agreed, by contract, to arbitrate "[a]ny controversy or claim arising out of or relating to" the JKD and KLG agreements; through an exchange of letters in November 2013, they extended the agreement to arbitrate to include disputes concerning Sunrise as well.  (Leviev Aff. ¶¶ 14, 16).

In October 2012, LGC demanded that the Kleins buy out LGC's interests in all three joint ventures, but the parties could not agree how to disentangle their interests.  (Leviev Aff. ¶¶ 11, 12).  Accordingly, in February 2013, LGC initiated arbitration proceedings against the Kleins. (Klein Decl. Ex. 11).[1]  The parties' agreements required arbitration before a panel of three arbitrators "with substantial experience in the diamond industry," one to be appointed by each of the parties and the third to be appointed by the party-appointed arbitrators.  (Leviev Aff. Ex. 2 ¶ 8.8; Ex. 5 ¶ 11.11; Ex. 10 ¶ 11.14).  LGC and the Kleins designated Israel Zahavi and Chaim Pluczenick, respectively, as arbitrators.  (Leviev Aff. Ex. 19).  Zahavi and Pluczenick, in turn, chose Jacob Bronner as the neutral arbitrator.  (Id.).  In September 2013, Bronner executed a notice of appointment in which he disclosed that he had "professional or social relationships" with Leviev and each of the other arbitrators, but otherwise indicated that he had no "other information that may lead to a justifiable doubt as to [his] impartiality or independence or create an appearance of partiality."  (Leviev Aff. Ex. 20).  With respect to Leviev, Bronner explained as follows: "While I do not have any social relationship or friendship with Mr. Leviev, I do see him from time to time in my business travels and we exchange pleasantries when we see each other."

---

[1]      Documents cited without reference to a Docket Number are currently filed under seal. Pursuant to an Order entered contemporaneously with this Opinion and Order, the parties are to show cause why those documents should remain under seal.  Accordingly, some or all of those documents may be docketed after this Opinion and Order is filed.

(*Id.*).  With respect to the other arbitrators, he stated: "I have done business with ZAHAVI and PLUCZENICK and will continue to do so."  (*Id.*).  The Kleins did not ask Bronner to elaborate; instead, they acknowledged and ratified his appointment.  (Leviev Aff. Ex. 21).

Around the same time, LGC filed a petition in New York state court seeking, among other things, preliminary injunctive relief in aid of arbitration.  (Leviev Aff. Ex. 25).  The state court denied the petition, holding that any request for injunctive relief should be addressed to the arbitrators.  (Leviev Aff. Ex. 26).  In November 2013, LGC sought preliminary relief from the arbitrators, including an interim award.  (Leviev Aff. Ex. 27).  On December 5, 2013, the panel issued an order granting that request in substantial part and ordering the Kleins to pay LGC approximately $102 million.  (Leviev Aff. Ex. 28).  The next day, however, the panel stayed its interim order so that the parties could pursue a global settlement.  (Leviev Aff. Ex. 29).  The stay remained in effect until November 2014, during which time the Kleins paid LGC approximately $67 million as a partial redemption of LGC's interests.  (Klein Decl. ¶ 24; Leviev Aff. Ex. 30).

In December 2014, LGC returned to the same New York state court in an effort to confirm the interim award.  (Leviev Aff. Ex. 31).  The Kleins — represented by new counsel (who also represent them here) — opposed confirmation, arguing that the award was non-final. (Leviev Aff. Ex. 32).  In addition, and more relevant for present purposes, the Kleins argued that Bronner and Zahavi should be removed from the panel on the grounds of misconduct and partiality.  (*Id.*).  More specifically, the Kleins contended that Bronner and Zahavi were improperly using their rulings to force a settlement from the Kleins and that Bronner had failed to fully disclose a prior relationship with Leviev.  (*Id.*).  In response to the motion, Bronner himself filed an affidavit in which, among other things, he defended his "good reputation" in the industry and touted his "honest[y]," "decency," "integrity," and "fairness."  (Levine Decl. Ex.

4

23, at 5).  In September 2015, the state court denied both confirmation of the interim order and the Kleins' cross-motion to disqualify the arbitrators as premature.  (Leviev Aff. Ex. 36).  With respect to the latter, however, the court further noted as follows: "Even if the court were to entertain the cross-motion seeking disqualification, the request would be denied because all objections were waived when [the Kleins] proceeded without objection long after [they] had knowledge of the alleged irregularities."  (*Id.*).

In the months after the state court's denial of the Kleins' request to remove Bronner, relations between and among the parties and the arbitrators soured further.  Some of the details are disputed, but, among other things, Respondent Malka Klein filed (and then dismissed) a lawsuit in New York state court accusing Leviev, Zahavi, and Bronner of racketeering, fraud, money laundering, and extortion; Bronner allegedly started receiving anonymous telephone threats; and the Kleins made a motion before the panel for Bronner's resignation, citing evidence obtained from Bronner's sister that he and Zahavi were partners in two businesses.  (Leviev Aff. Ex. 37; Ex. 22 ¶ 3.b; Ex. 39).  The panel rejected the Kleins' motion, writing that the Kleins' actions were an "unprecedented an[d] improper attempt to interfere with the performance by a duly appointed arbitrator."  (Leviev Aff. Ex. 22 ¶ 3).  Pluczenik — the Kleins' party-chosen arbitrator — then resigned, alleging that he had been "shut out completely from the panel's decision making," that Bronner had "betrayed [his] personal trust by concealing information" from him, and that he no longer wanted to take part in a "biased, unfair process."  (Levine Decl. Ex. 31).  The Kleins promptly replaced him with Eytan Cohen.  (Levine Decl. Ex. 32).

On February 9, 2016, Bronner sent an email to the parties starting that "the business" he "conducted and continue to conduct" with Zahavi "include[s] also partnering in some businesses."  (Levine Decl. Ex. 35).  Days later, the arbitrators held a seven-day hearing in Israel

during which they heard testimony from eight witnesses and received hundreds of exhibits. (Leviev Aff. ¶ 36).  On May 17, 2016, after the hearing but before any ruling, the panel's counsel sent an email to the parties sharing that Zahavi and Cohen had just "learned" that Bronner "was convicted of some type of financial criminal activity by the courts of Belgium" — charges that apparently dated back to early 2013.  (Levine Decl. Ex. 44).  More specifically, Bronner and approximately 100 other defendants were convicted of tax fraud and other offenses relating to a scheme involving the use of sham transactions to nominally export diamonds from Belgium while, in fact, reselling them on the black market.  (Leviev Aff. Ex. 44).  In the wake of the conviction, the Kleins asked Bronner for additional disclosures regarding his conviction and requested — once again — that he resign from the panel.  (Levine Decl. Ex. 51).  LGC argued that the conviction should have no bearing on the panel's work.  (Leviev Aff. Ex. 47).  The panel ultimately agreed with LGC and continued its work.  (Leviev Aff. ¶ 39).

On June 30, 2016, the arbitration panel finally issued its award.  (Leviev Aff. Ex. 1).  The panel found that the Kleins had breached the parties' agreements and awarded LGC approximately $112 million (on top of the $67 million that the Kleins had already paid), plus pre-judgment interest.  (*Id*. at 3).  Significantly, the panel also found "each and all of the Respondents" — including the individual Kleins, who had only been signatories to the JKD joint venture agreement, but who had participated in the arbitration proceedings for all three ventures — to be "liable jointly and severally" to LGC.  (*Id*.)  Finally, the panel awarded LGC certain declaratory and injunctive relief, including the rights to the "Leviev" trademark.  (*Id*. at 2).  That same day, the Kleins filed a motion in New York state court — pursuant to New York law, *see* N.Y. CPLR § 7511, as part of the same case that LGC itself had initiated in 2013 with its request for injunctive relief in aid of the arbitration — seeking to vacate the award, and LGC filed its

6

petition to confirm the award in this Court.  (LGC Pet. ¶ 6).  On July 6, 2016, LGC filed a Notice

of Removal and removed the state case to this Court.  (16-CV-5352, Docket No. 1).

## DISCUSSION

The central dispute between the parties is whether the arbitration award should be

confirmed or vacated.  Before resolving that dispute, however, the Court must address several

threshold issues raised by the Kleins: whether the Court has subject-matter jurisdiction; whether

the removed case should be remanded back to New York state court; and, if so, whether the

Court should dismiss the remaining federal case on abstention grounds.  (Kleins' Opp'n 19-26).

## A.  Subject-Matter Jurisdiction

As noted, the Kleins argue first that the Court lacks subject-matter jurisdiction altogether.

Because there is no diversity of citizenship between the parties, and because a petition to compel

arbitration does not independently present a federal question, *see, e.g.*, *Bakoss v. Certain*

*Underwriters at Lloyds of London Issuing Certificate No. 0510135*, 707 F.3d 140, 142 n.4 (2d

Cir. 2013), whether the Court has jurisdiction turns on the United Nations Convention on the

Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330

U.N.T.S. 38 (the "New York Convention"), codified in the United States as Chapter 2 of the

Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201-208.  (LGC Pet. ¶ 6; LGC Reply 3-4).

Section 202 of the FAA provides, in relevant part, as follows:

> An agreement or award arising out of . . . a [commercial] relationship which is
> entirely between citizens of the United States shall be deemed not to fall under the
> Convention unless that relationship involves property located abroad, envisages
> performance or enforcement abroad, or has some other reasonable relation with
> one or more foreign states.

Thus, if a party seeks to confirm an arbitration, as here, jurisdiction is proper under the New

York Convention only if the legal relationship between the parties is not "entirely domestic in

scope."  *Smith/Enron Cogeneration Ltd P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d

88, 92 (2d Cir. 1999).  The Second Circuit has defined relationships that are "entirely domestic in scope" to mean those that (1) are "between two United States citizens"; (2) "involv[e] property located in the United States"; *and* (3) "ha[ve] no reasonable relationship with one or more foreign states."  *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 19 (2d Cir. 1997); *see also HBC Sols., Inc. v. Harris Corp.*, No. 13-CV-6327 (JMF), 2014 WL 3585503, at *3 (S.D.N.Y. July 18, 2014).

Applying those standards here, the Court concludes that it has subject-matter jurisdiction over the parties' disputes.  Although the parties are New York citizens and the property at issue consists of membership interests in New York limited liability companies, the "relationship" between the parties plainly "involve[d] property located abroad" and "evisage[d] performance . . . abroad."  9 U.S.C. § 202.  Indeed, the relationship between LGC and the Kleins centers on three joint ventures in the international diamond industry.  Thus, for example, a disclosure schedule attached to one of the agreements between the Kleins and LGC explicitly acknowledged that JKD buys and sells diamonds through a South African affiliate.  (Leviev Aff. Ex. 6 § 4.3.4(b)).  Similarly, the Trademark License Agreement covers the European Union and eighteen other countries.  (Leviev Aff. Ex. 12, at 11).  And during the arbitration proceedings, the Kleins alleged a breach of the Trademark License Agreement for the "Leviev" trademark through sales in London and Russia.  (Leviev Aff. Ex. 16 ¶ 188-89).  Even Martin Klein admitted that JKD has "factories and offices all over the globe" and that KLG owns "boutiques in several cities around the world, including New York, London, Dubai and Singapore."  (Leviev Aff. Ex. 7 ¶¶ 29, 33).

These facts distinguish this case from the authorities cited by the Kleins.  (Kleins' Opp'n 22-23 & n.15).  In *Jones v. Sea Tow Servs. Freeport NY Inc.*, 30 F.3d 360 (2d Cir. 1994), for

example, the only foreign connection was the parties' agreement to arbitrate their disputes in England, which the Second Circuit held was insufficient lest arbitration clauses become "a self-generating basis for jurisdiction." *Id.* at 366.  And each of the other cases cited by the Kleins — including *Bethlehem Steel Corp. v. Songer Corp.*, No. 92-CV-2678 (JSM), 1992 WL 110735 (S.D.N.Y. May 11, 1992) — involved only one party's dealings with foreign third parties.  *See id.* at *1.  By contrast, the relationship between the parties here involved property around the world and envisaged performance abroad.  It follows that the New York Convention applies.  *See Lander Co., Inc. v. MMP Invs., Inc.*, 107 F.3d 476, 478-82 (7th Cir. 1997) (finding jurisdiction with respect to a contract to sell products in Poland); *HBC Sols.*, 2014 WL 3585503, at *3 (finding jurisdiction for a sale of a business division with "global operations"); *Holzer v. Mondadori*, No. 12-CV-5234 (NRB), 2013 WL 1104269, at *5 (S.D.N.Y. Mar. 14, 2013) (finding jurisdiction with respect to an agreement to purchase real estate in Dubai); *New Avex, Inc. v. Socata Aircraft Inc.*, No. 02-CV-6519 (DLC), 2002 WL 1998193, at *3 (S.D.N.Y. Aug. 29, 2002) (finding jurisdiction with respect to a contract between two American corporations involving the sale of French aircraft in France); *Heather Trading Corp. v. Voest-Alpine Trading U.S.A. Corp.*, Nos. 85-CV-823 (SWK), 85-CV-913 (SWK), 1986 WL 4542, at *2 (S.D.N.Y. April 8, 1986) (finding jurisdiction with respect to a contract to deliver crude oil in Ecuador).

## B.  Motion To Remand

The Kleins' alternative argument for why this Court should not decide the parties' disputes about the arbitration is multi-pronged.  First, they attack the propriety of LGC's removal of the state court action pursuant to Title 9, United States Code, Section 205, which provides that a "defendant" — and only a "defendant" — may remove an action relating to an arbitration agreement from state court to federal court "at any time before the trial thereof."  (Kleins' Opp'n

23-24).  The Kleins contend that LGC's removal was improper both because LGC was the plaintiff in the state court action and because its removal was untimely.  (*See id.*).  Second, they assert that, if the state case is remanded, this Court should — pursuant to *Colorado River Water Conservation District v. United States,* 424 U.S. 800 (1976) — abstain from exercising jurisdiction over the remaining federal case in favor of the remanded state case.  (*See* Kleins' Opp'n 24-26; Kleins' Reply 12 (making clear that the argument for abstention is dependent on a remand of the removed action)).  The Court concludes that LGC's removal of the state case was proper and, accordingly, does not reach Respondents' argument for *Colorado River* abstention.

The Kleins' first attack on removal of the state case turns on whether LGC was a "defendant" in that case for purposes of Section 205.  Significantly, it is well established that federal law — not state law — "determines who is plaintiff and who is defendant" for removal purposes.  *Chicago, R.I. & P.R. Co. v. Stude*, 346 U.S. 574, 580 (1954).  Moreover, as Justice Oliver Wendell Holmes made clear long ago, the relevant inquiry is a functional one, *see Mason City & Ft. D.R.R. Co. v. Boynton,* 204 U.S. 570, 580 (1907), pursuant to which "the court realigns the parties in their proper perspectives regardless of their denominations in the pleadings," *OPNAD Fund, Inc. v. Watson*, 863 F. Supp. 328, 332 (S.D. Miss. 1994).  *Mason City* involved a condemnation proceeding relating to a railroad's appropriation of land.  Under Iowa law, either the landowner or the railroad could bring an action in state court to fix damages, but regardless of who initiated suit the landowner was automatically denominated the plaintiff.  *See* 2014 U.S. at 579.  In the particular case before the Supreme Court, the landowner had initiated the state court proceedings, but then removed the action to federal court.  The question presented was whether the landowner was nonetheless "a defendant within the meaning of the removal statute."  *Id.* at 574.  The Court answered in the affirmative and thus upheld the landholder's

removal.  "The intent of the railroad to get the land," Justice Holmes reasoned, "is the mainspring of the proceedings from beginning to end, and the persistence of that intent is the condition of their effect . . . .  Therefore, in a broad sense, the railroad is the plaintiff, as the institution and continuance of the proceedings depend upon its will."  *Id.* at 580.

In *Minkoff v. Budget Dress Corp.*, 180 F. Supp. 818 (S.D.N.Y. 1960), the Court applied Justice Holmes's functional test to circumstances analogous to those presented here.  There, the Joint Board of Dress and Waistmakers' Union of Greater New York (the "Union") initiated arbitration against Budget Dress Corporation ("Budget Dress").  In November 1958, Budget Dress instituted proceedings in state court to stay the arbitration.  The state court denied that motion, and the case proceeded to arbitration.  In August 1959, the Union returned to state court by filing a motion to confirm the arbitration, and Budget Dress then removed the action to federal court.  After quoting at length from Justice Holmes's opinion in *Mason City*, Judge Dimock concluded that Budget Dress was the "defendant" for removal purposes even though it had first initiated the state court proceedings.  "[T]he 'mainspring of the proceedings,'" he opined, "is surely the Union's intent to have its complaints arbitrated and resolved in its favor, and the 'institution and continuance of the proceedings depend upon its will.'  The Union instituted the proceeding by filing complaints with the [arbitrator], and, were the Union to drop its demands, the case would be at an end.  The Union, therefore, as the party in control of the litigation is the plaintiff in this case."  *Id.* at 824 (quoting *Mason City*, 204 U.S. at 580).

For similar reasons, the Court here concludes that LGC "is the 'true defendant' under the Supreme Court's functional test."  *In re Gardner*, No. 06-CV-9154 (SSV), 2007 WL 625825, at *3 (E.D. La. Feb. 26, 2007).  To be sure, LGC initiated the state-court proceedings in the first instance by filing its petition for injunctive relief in aid of arbitration and, later, seeking

confirmation of the interim award.  But once the arbitration commenced, there was nothing

pending in state court until the Kleins filed their petition to vacate the award.  At that point —

that is, at the moment of removal — "continuance of the proceedings depend[ed] upon [the

Kleins'] will."  *Mason City*, 204 U.S. at 580.  In other words, the Kleins were "in control of the

litigation"; if it were "to drop its demands, the case would [have been] at an end."  *Minkoff*, 180

F. Supp. at 824.  Granted, under New York state law, LGC was denominated the petitioner even

at that point in the proceedings.  *See* N.Y. CPLR § 7502(a), (a)(iii) (providing that an application

arising out of an arbitrable controversy may be brought as a "special proceeding" and that,

"[n]otwithstanding the entry of judgment, all subsequent applications shall be made by motion"

in the same special proceeding).  But that idiosyncratic provision is no different from the Iowa

state law at issue in *Mason City* and, thus, has no bearing on whether LGC is the "defendant" for

removal purposes.  *See* 204 U.S. at 579 ("[T]he word 'defendant' as . . . used [in the federal

removal statute] is directed toward more important matters than the burden of proof or the right

to open and close.  It is quite conceivable that a state enactment might reverse the names which,

for the purposes of removal, this court might think the proper ones to be applied.").  As the party

"opposing or resisting" the Kleins' claim, LGC was the "defendant" who could remove the

action pursuant to Section 205.  *Gardner*, 2007 WL 625825, at *2; *see also OPNAD*, 863 F.

Supp. at 334 ("Under the functional test for party status, courts are not required to look solely to

the party which initiates the claim.  Rather, a court looks to which party is attempting to achieve

a particular result and which party is resisting the other party's claims.").

Neither *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352 (2d Cir. 1995), nor *West v. Zurich

American Insurance Co.*, No. CIV.A. 02-CV-546, 2002 WL 1397465 (E.D. Pa. June 26, 2002),

upon which the Kleins rely (Kleins' Opp'n 23; Kleins' Reply 11), calls for a different result.  In

*Oppenheimer*, the Court did state that "for purposes of removal of arbitration questions, the plaintiff is the party who first invokes the aid of a court." *Id.* at 356. But that language must be read in the context of the question presented: whether one party who initiates an arbitration proceeding against another should, on the basis of that out-of-court proceeding, be treated as the plaintiff if the latter then initiates a state-court action relating to the arbitration. The Court did not have occasion to consider circumstances of the sort presented here, and its opinion should not be read to hold that the party who first invokes the aid of a court must be treated as the plaintiff at all times thereafter, as such a reading would conflict with *Mason City*.

The non-binding decision in *West* — which considered whether "the filing of a petition to vacate an arbitration award be considered an 'initial pleading' [for purposes of removal] where the subject arbitration had taken place after a state court compelled arbitration," 2002 WL 1397465, at *2 — is certainly more on point, but it is unpersuasive. The *West* Court based its holding on a conclusion that, under Pennsylvania law, "each arbitration [is] a single, unitary proceeding," with the party first invoking a court's jurisdiction treated as the plaintiff in all subsequent proceedings. *Id.* at *3. In doing do, however, it ignored the Supreme Court's directive that federal law — not state law — "determines who is plaintiff and who is defendant" for removal purposes. *Stude*, 346 U.S. at 580. (Notably, the *West* Court failed to cite, let alone discuss, *Mason City* and its progeny.) Thus, to the extent that *West* would call for a different result here, the Court declines to follow it as unsound.

The Kleins' second argument for remand — that LGC's removal was untimely — requires less discussion than their first, but fares no better. As noted, under Section 205, a defendant may remove a case to federal court "at any time before the trial" of the action. The term "trial" includes "resolution of actively litigated substantive issues." *Pan Atl. Grp., Inc. v.*

*Republic Ins. Co.*, 878 F. Supp. 630, 641 (S.D.N.Y. 1995); *accord New Avex, Inc. v. Socata Aircraft Inc.*, No. 02-CV-6519 (DLC), 2002 WL 1998193, at *4 (S.D.N.Y. Aug. 29, 2002). Here, when LGC removed the case to federal court, there had been no "trial."  Although the state court had denied a preliminary injunction and had declined to confirm the interim award on the ground that it was premature, the court did not make any rulings on the merits, let alone do so with respect to the final award at issue now.  That is, "no substantive issues in the instant case were resolved," making LGC's removal under Section 205 timely.  *New Avex*, 2002 WL 1998193, at *4 (finding a removal timely notwithstanding the state court's having entered a temporary restraining order staying arbitration and refusing to lift the stay at a preliminary injunction hearing); *cf. LaFarge Coppee v. Venezolana De Cementos, S.A.C.A.*, 31 F.3d 70, 72 (2d Cir. 1994) (finding removal to be untimely after the state court had granted an injunction because the state court proceedings "resulted in an adjudication of the entirety of the claim that the plaintiffs tendered for decision"); *Pan Atl. Grp.*, 878 F. Supp. at 640 (finding removal to be untimely after the state court had "adjudicate[ed] [] a significant portion of the relief [plaintiff] sought [on the merits]").  Accordingly, the Kleins' arguments for remand of the state-court action must be and are rejected.[2]

---

[2]      As noted, the Kleins' arguments for *Colorado River* abstention are moot in light of the denial of its motion to remand, as there are no parallel proceedings in favor of which this Court could abstain from exercising jurisdiction.  In any event, even if the Court were to remand the state-court action, it is not clear that abstention would be appropriate.  *See IFC Interconsult, AG v. Safeguard Int'l Partners, LLC.*, 438 F.3d 298, 306 (3d Cir. 2006) (refusing to abstain because pre-arbitration litigation was complete and the state-court action had been "effectively discontinued"); *TapImmune, Inc. v. Gardner*, No. 14-CV-6087 (GHW), 2015 WL 4111881, at *4 (S.D.N.Y. July 8, 2015) (rejecting the argument that "once a state court has ruled on a motion related to the underlying merits of an arbitration, a federal court is precluded from hearing the case"); *HCC Aviation Ins. Grp., Inc. v. Emp'rs Reinsurance Corp.*, No. 3:05-CV-744M (BML), 2005 WL 1630060, at *2 (N.D. Tex. June 30, 2005) (concluding that abstention was inappropriate where the state court had "conducted only limited proceedings . . . and ha[d] made no more progress on the post-arbitration proceedings").

## C.  Challenges to the Award

Thus, the Court turns to the question of whether the award should be confirmed or vacated.  Naturally, LGC argues that there are no grounds to vacate the award and that it should be confirmed.  (Docket No. 26 ("LGC Mem.") 12-14).  By contrast, the Kleins contend that the award should be vacated on either of two grounds: (1) because the arbitrators were partial and corrupt and (2) because the panel exceeded its powers and acted in manifest disregard of the law. (Kleins' Opp'n 26-39).  The Court will address each of the Kleins' arguments in turn, but first must resolve a dispute between the parties over which law to apply.

### 1.  The Applicable Legal Standard

LGC contends that because the New York Convention applies, the only grounds to vacate the award are those specifically enumerated in the Convention.  (LGC Mem. 12-14).  The Kleins, on the other hand, insist that either the FAA or New York law should apply because the Court is authorized to vacate the award on any ground available under domestic arbitral law.  (Kleins' Opp'n 27-28).  On this front, the Kleins have the better of the argument.

Under the New York Convention, a party retains the right to seek vacatur of an award in the "country in which, or under the [arbitral] law of which, the award was made."  Convention art. V(1)(e); *see also Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 21 (2d Cir. 1997).  A court in such a country — called a country of "primary jurisdiction" — is "free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief."  *Yusuf*, 126 F.3d at 23; *see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 287-88 (5th Cir. 2004).  By contrast, a court in another country — called a country of "secondary jurisdiction" — may only refuse to enforce an award, and then only on the limited grounds set

forth in Article V of the Convention.  *See Yusuf*, 126 F.3d at 23; *see also Karaha Bodas*, 364

F.3d at 287-88.  Significantly, an award is not necessarily "made" where the arbitration

"physically occurred."  *Karaha Bodas*, 364 F.3d at 292.  Instead, it is "'made in' . . . the place of

the arbitration in the legal sense and the presumptive source of the applicable procedural law."

*Id.*; *see also Int'l Standard Elec. Corp. v. Bridas Sociedad Anonima Petrolera, Indus. Y*

*Commercial*, 745 F. Supp. 172, 178 (S.D.N.Y. 1990) (finding the "procedural law under which

the arbitration was conducted" to be the determinant of whether an award was made "under the

law" of that country for the purposes of Article VI(e)).

Applying those standards here, there is little question that the award was "made in" the

United States and under United States (or New York) law and, accordingly, that the United

States is the "primary jurisdiction."  Although the parties' arbitration agreements did not specify

the arbitral law to be applied or the location for the arbitration, they called for arbitration

"pursuant to such rules as determined by a majority of [the] three arbitrators." (Klein Decl. Ex. 3

§ 8.8; Ex. 7 § 11.14; Leviev Aff. Ex. 18).  And throughout the proceedings, the arbitrators — and

the parties — looked to and applied either New York or United States law.  For example, when

the Kleins objected to the panel's selection of Israel as "the most convenient forum" for the final

hearing, the panel ruled that "[a]rbitrators are vested with broad powers under New York law."

(Levine Decl. Ex. 55, at 6).  Additionally, throughout the hearing itself, the parties and the

arbitrators made repeated reference to New York law.  (*See* Levine Decl. Ex. 1, at 8, 333-34,

384, 478).  LGC's own counsel, for example, emphasized that "this is a proceeding that is

governed by New York law and . . . New York practice" and that claims with respect to

Bronner's bias and corruption should be decided by a New York court.  (*Id*. at 11, 1640).  The

arbitrators agreed.  (*See id.* at 619 (Zahavi, citing "U.S. arbitration law," for his decision that the

panel could not limit the length of a witness' cross-examination); Levine Decl. Ex. 55, at 6
(applying New York law to the arbitration venue decision)).  Put simply, at no point did any
arbitrator or party suggest that Israeli — or any other country's — arbitral law applied.  Thus,
notwithstanding the fact that the arbitration hearing itself was held in Israel, the parties and
arbitrators firmly established the United States as the primary jurisdiction.  *See, e.g.*, *Karaha
Bodas*, 364 F.3d at 292 ("The arbitration proceeding in this case physically occurred in Paris, but
the Award was 'made in' Geneva, the place of the arbitration in the legal sense and the
presumptive source of the applicable procedural law.").

      That does not fully resolve the question, however, as the Kleins ask the Court to apply
New York law rather than the FAA on the ground that the arbitrators relied on New York arbitral
law.  (Kleins' Opp'n 28-29).  In support of that argument, the Kleins rely principally on *Volt
Information Sciences, Inc. v. Board. of Trustees of Leland Stanford Junior University*, 489 U.S.
468, 476 (1989), to suggest that parties may contractually agree that state arbitral law, rather than
the FAA, should apply to an arbitration.  (Kleins' Opp'n 28).  That may be so, but the parties
here did not contractually agree to apply New York's vacatur standards to their arbitration.
Instead, the agreements between the parties, unlike those at issue in the cases cited by the Kleins,
were silent as to the choice of arbitral law.  *Cf. Cnty. of Nassau v. Chase*, 402 F. App'x 540, 541
(2d Cir. 2010) (analyzing an agreement that specified "that any appeal from an arbitration award
is to be governed exclusively by New York state law").  In similar circumstances, courts in this
District have applied the FAA.  *See CRC Inc. v. Computer Scis. Corp.*, No. 10-CV-4981 (HB),
2010 WL 4058152, at *2 (S.D.N.Y. Oct. 14, 2010); *Penrod Mgmt. Grp. v. Stewart's Mobile
Concepts, Ltd.*, No. 07-CV-10649 (JGK), 2008 WL 463720, at *2 (S.D.N.Y. Feb. 19, 2008).
This Court will do the same.

Under Section 9 of the FAA, a reviewing court must confirm an arbitration award unless one of the statutory grounds for vacatur or modification is satisfied. *See* 9 U.S.C. § 9; *see also STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 74 (2d Cir. 2011). Section 10 of the FAA, in turn, establishes four instances in which a court may vacate an award:

    (1)    where the award was procured by corruption, fraud, or undue means;

    (2)    where there was evident partiality or corruption in the arbitrators, or either of them;

    (3)    where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

    (4)    where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). In addition, the Second Circuit has held that a court may vacate an award if the arbitrator "has acted in manifest disregard of the law," *Porzig v. Dresdner, Kleinwort, Benson, N.A. LLC*, 497 F.3d 133, 139 (2d Cir. 2007), or "where the arbitrator's award is in manifest disregard of the terms of the parties' relevant agreement," *Schwartz v. Merrill Lynch & Co., Inc.*, 665 F.3d 444, 452 (2d Cir. 2011) (internal quotation marks and alteration omitted); *see also Doscher v. Sea Port Grp. Sec., LLC*, 832 F.3d 372, 375 n.3 (2d Cir. 2016). A court may vacate on those bases, however, only in "those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent." *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) (internal quotation marks and alterations omitted).

Significantly, "'[a]rbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.'" *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008) (quoting *Willemijn Houdstermaatschappij, BV v. Standard Microsys. Corp.*, 103 F.3d 9, 12 (2d Cir. 1997))

(alteration in original). Among other things, the "'party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high.'" *STMicroelectronics*, 648 F.3d at 74 (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)). Moreover, "[t]he arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case." *D.H. Blair & Co.*, 462 F.3d at 110 (internal quotation marks omitted). Deference to the arbitrators' interpretation of contracts is especially strong. Indeed, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, a court's conviction that the arbitrator has committed serious error in resolving the disputed issue does not suffice to overturn his decision." *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81, 86 (2d Cir. 2009) (internal quotation marks omitted); *see also Schwartz*, 665 F.3d at 452 ("[I]nterpretation of the contract terms is within the province of the arbitrator and will not be overruled simply because we disagree with that interpretation. If the arbitrator has provided even a barely colorable justification for his or her interpretation of the contract, the award must stand." (internal quotation marks, alteration, and citation omitted)).

## 2. Evident Partiality and Corruption

The Kleins' first — and strongest — argument for vacatur is based on the alleged evident partiality and corruption of Bronner, the neutral arbitrator. As the Second Circuit has held, "evident partiality . . . will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.,* 668 F.3d 60, 72 (2d Cir. 2012). "Unlike a judge, who can be disqualified in any proceeding in which his impartiality might reasonably be questioned, an arbitrator is disqualified only when a reasonable person, considering all the circumstances, would *have* to

conclude that an arbitrator was partial to one side." *Id.* (citation omitted).  Although "proof of

actual bias is not required" and "partiality can be inferred from objective facts inconsistent with

impartiality," the party seeking vacatur must prove evident partiality with "something more than

the mere appearance of bias."  *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable

Trust,* 729 F.3d 99, 104 (2d Cir. 2013) (alterations and internal quotation marks omitted).  More

specifically, the party seeking vacatur "bear[s] a high burden of demonstrating objective facts

inconsistent with impartiality."  *Id.* at 105 (internal quotation marks omitted).

An arbitrator's failure "to disclose a relationship or interest that is strongly suggestive of

bias in favor of one of the parties" is "[a]mong the circumstances under which the evident-

partiality standard is likely to be met."  *Scandinavian Reins.,* 668 F.3d at 72.  At the same time,

the Second Circuit has "repeatedly cautioned that [it is] not 'quick to set aside the results of an

arbitration because of an arbitrator's alleged failure to disclose information.'"  *Id.* (quoting

*Lucent Techs. Inc. v. Tatung Co.*, 379 F.3d 24, 28 (2d Cir. 2004)).  An undisclosed relationship

does not require vacatur, for example, if it is "too insubstantial."  *Lucent Techs.*, 379 F.3d at 30.

Additionally, "[w]here a party has knowledge of facts possibly indicating bias or partiality on the

part of an arbitrator he cannot remain silent and later object to the award of the arbitrators on that

ground.  His silence constitutes a waiver of the objection."  *AAOT Foreign Econ. Ass'n (VO)

Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 139 F.3d 980, 982 (2d Cir. 1998); *see also,

e.g.*, *Cook Indus., Inc. v. C. Itoh & Co. (America) Inc.*, 449 F.2d 106, 107-08 (2d Cir. 1971)

("Appellant cannot remain silent, raising no objection during the course of the arbitration

proceeding, and when an award adverse to him has been handed down complain of a situation of

which he had knowledge from the first."); *Ilios Shipping & Trading Corp. v. Am. Anthracite &

Bituminous Coal Corp.*, 148 F. Supp. 698, 700 (S.D.N.Y. 1957) (applying the waiver doctrine

where a party "knew before the arbitration" that the other party was associated with one of the arbitrators and "could have inquired concerning the business relationship of [the arbitrator] to any party interested in the arbitration").

In this case, the Kleins' broadest attack on Bronner's impartiality is based on his alleged failure to disclose the nature and extent of his relationships with Zahavi and Leviev.  (Kleins' Opp'n 33-35).  Specifically, the Kleins contend that Bronner failed to disclose that (1) he and Zahavi were partners in a "multi-million dollar diamond venture" involving an entity called Brilliant Crystal and (2) Brilliant Crystal shares were transferred to F.T.S. Worldwide Corporation ("FTS"), an entity affiliated with Leviev.  (Kleins' Reply 5; Kleins' Opp'n 15-16).  The biggest problem with this argument is that Bronner did disclose in his initial notice of appointment, dated September 23, 2013, that he had "done business with Zahavi" (as well as the Kleins' appointed arbitrator) and that he planned to "continue to do so."  (Leviev Aff. Ex. 20).  Additionally, it should have come as no surprise that Bronner might have ties to the other arbitrators or the parties, as the parties agreed that the arbitrators should have "substantial experience in the diamond industry."  (Leviev Aff. Ex. 2 § 8.8).  There is no prohibition on requiring such familiarity with an industry; indeed, it is "a principal attraction of arbitration." *Lucent Techs.*, 379 F.3d at 30-31.  But it "often comes at the expense of complete impartiality." *Id.* (internal quotation marks omitted).  Indeed, "specific areas" — including, no doubt, the international diamond trade — "tend to breed tightly knit professional communities.  Key members are known to one another, and in fact may work with, or for, one another, from time to time."  *Morelite Const. Corp. (Div. of Morelite Elec. Servs.) v. N.Y. City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 83 (2d Cir. 1984); *see Transportes Coal Sea de Venezuela C.A. v. SMT Shipmanagement & Transp. Ltd.*, No. 05-CV-9029 (KMK), 2007 WL 62715, at *3

(S.D.N.Y. Jan. 9, 2007) ("[A]rbitrators, who are often chosen directly from the niche business communities whose disputes they are called upon to arbitrate, may have pre-existing relationships with one or both of the parties to an arbitration, or another arbitrator.").

In light of those facts and circumstances, the Kleins' attack on Bronner's disclosure misses its mark.  *See, e.g.*, *NGC Network Asia, LLC v. PAC Pac. Grp. Int'l, Inc.*, 511 F. App'x 86, 88 (2d Cir. 2013) ("Because the arbitrator properly complied with his disclosure obligations, the concern that nondisclosure might create an appearance of bias or even be evidence of bias is simply not present in this case." (alterations and internal quotation marks omitted)).  And while Bronner could have been — and, no doubt, should have been — more forthcoming (revealing in the first instance, for example, that his "business" with Zahavi included partnerships), he shared at least enough to put the Kleins on inquiry notice.  Yet they failed to investigate, let alone object, until after the panel had issued its interim award in LGC's favor (and the Kleins obtained new counsel).  (Leviev Aff. Ex. 21; *see also* Leviev Aff. Ex. 36 (New York state court decision denying the Kleins' motion to disqualify Bronner and Zahavi after the interim award in part on the ground that the Kleins had waived "all objections" by "proceed[ing] without objection long after it had knowledge of the alleged irregularities")).  The Kleins' "belated cry of 'bias' cannot now form a basis for setting aside the award; its silence constituted a waiver of this objection." *Swift Indep. Packing Co. v. Dist. Union Local One, United Food & Commercial Workers Int'l Union, AFL-CIO, C.L.C.*, 575 F. Supp. 912, 916 (N.D.N.Y. 1983); *see Lucent Techs.*, 379 F.3d at 31 (holding that an undisclosed relationship between two arbitrators did not warrant vacatur where the losing party "was on notice" that the arbitrators had worked together but "did not object to that fact prior to arbitration, nor did it choose to investigate that relationship more deeply").

In any event, the Kleins do not substantiate their assertion that the undisclosed partnerships implicated Bronner in a meaningful way.  In advancing this argument, the Kleins rely principally on an affidavit from Bronner's sister, Ruth Bronner, and two attachments to it that she identifies as agreements between Bronner and Zahavi "reflecting" their partnership or "apparent partnership" in certain businesses.  (Kleins' Opp'n 12, 34-35; Levine Decl. Ex. 27 ("Ruth Bronner Aff."), Exs. 1-2).  But Ruth Bronner does not identify a non-hearsay basis for her alleged knowledge.  *See Time Warner Cable of N.Y. City LLC v. Int'l Bhd. of Elec. Workers*, 170 F. Supp. 3d 392, 410 (E.D.N.Y. 2016) (requiring "admissible evidence" in deciding a motion to confirm an arbitral award).  And, in any event, the affidavit may not be considered because it is not properly sworn and notarized and lacks any reference to whether it was made under penalty of perjury.  *See* 28 U.S.C. § 1746; *see also, e.g.*, *D.H. Blair*, 462 F.3d at 109 (stating that petitions to confirm or vacate arbitration awards are "treated as akin to [] motion[s] for summary judgment"); *S.E.C. v. Simonson*, No. 96-CV-9695 (MBM), 2000 WL 781084, at *2 (S.D.N.Y. June 19, 2000) (Mukasey, J.) ("[T]he court may not consider unsworn statements and unattached documents, and summary judgment therefore may not be resisted on the basis of them.").[3]  As for the purported agreements between Bronner and Zahavi, neither bears Bronner's signature. (Ruth Bronner Aff. Ex. 1-2).  In short, with respect to the allegedly undisclosed relationship between Bronner and Zahavi, the Kleins fail to meet the "high burden of demonstrating objective facts inconsistent with impartiality." *Kolel,* 729 F.3d at 105 (internal quotation marks omitted).

The Kleins' contentions regarding Bronner's dealings with Leviev fall even more short. First, the Kleins learned as early as December 2013 that Bronner and Leviev might have "been

---

[3]     On top of all that, Bronner and his sister are apparently not on the best terms.  (*See* LGC Opp'n 14 (noting that Bronner and his sister are "embroiled in litigation," citing *In re Bronner*, No. 2012-2271, 2016 WL 258760 (N.Y. Sur. Ct. Jan. 15, 2016)).

actively engaged in business together" (Levine Decl. Ex. 11 ¶¶ 63-64), yet consciously decided not to press the issue for over a year — again, until after the unfavorable interim arbitral award was issued and they were represented by new counsel.  (Leviev Aff. Ex. 32, at 40-41).  Second, the transaction at issue — between Brilliant Crystal and FTS — took place in 2005, almost eight years before the arbitration proceedings even began.  (Ruth Bronner Aff. Ex. 3).  And finally, by that time, Leviev was no longer directly associated with FTS.  (Leviev Reply Aff. ¶¶ 11-13 & Ex. 35).  In short, the Kleins present no concrete evidence to suggest, let alone prove, that any undisclosed dealings between Bronner and Leviev were more than "indirect, general or tangential." *Transportes Coal Sea de Venezuela C.A.*, 2007 WL 62715, at *6.  That is not enough "to warrant vacating the award." *Lucent Techs.,* 379 F.3d at 30 (holding that co-ownership of an airplane a decade before the arbitration was "too insubstantial to require vacatur" (internal quotation marks omitted)).[4]

The Kleins are arguably on firmer ground in seeking vacatur based on Bronner's failure to disclose his indictment and conviction, if only because they raised the issue promptly after the conviction was disclosed.  (Levine Decl., Exs. 46, 51).  But federal courts have been unreceptive to the argument that undisclosed legal trouble of an arbitrator requires vacatur under the FAA absent a showing that the legal trouble affected the outcome of the arbitration in some

---

[4]    The Kleins contend that the Court should infer bias from Bronner's refusal to respond to its demand, in December 2015, for a "full factual disclosure concerning his business relationships with Zahavi." (Kleins' Opp'n 13, 34-35; *see* Levine Decl. Ex. 30).  At that point, however, the Kleins were aggressively seeking Bronner's disqualification (and one of the Kleins had sued him in state court), so he may have had various reasons for his refusal.  In any event, the Second Circuit has held that it is not "appropriate to vacate an award solely because an arbitrator fails to consistently live up to his or her announced standards for disclosure, or to conform in every instance to the parties' respective expectations regarding disclosure.  The nondisclosure does not by itself constitute evident partiality." *Scandinavian Reins. Co.*, 668 F.3d at 76-77 (footnote omitted).

demonstrable way.  *See, e.g.*, *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 646 (9th Cir. 2010); *United Transp. Union v. Gateway W. Ry. Co.*, 284 F.3d 710, 712 (7th Cir. 2002).  *United Transportation Union*, in which the neutral arbitrator ("a lawyer named Fredenberger") concealed that he had been convicted of a felony tax offense between the arbitration hearing and the panel's ruling, is instructive.  284 F.3d at 711.  In an opinion by Judge Posner, the Seventh Circuit held that Fredenberger's conviction did not warrant vacatur under a law analogous to Section 10(a) of the FAA.  *See id.*  "Fredenberger's criminal violation of federal tax law," the Court reasoned, "was unrelated to the grievances that he was asked to arbitrate, and there is no suggestion that his violation would have inclined him in favor of (or, for that matter, against) the union."  *Id.* at 712.

Judge Posner acknowledged that Fredenberger's "failure to disclose his criminal conviction" might have been "material in the sense that one or both parties might well have decided that they did not want to have a criminal resolve their dispute."  *Id.*  "But," he continued,

> it does not follow that it should be a basis for setting aside his award.  So far as appears, the fraud was completely harmless; for there is no evidence or reason to think that Fredenberger's conviction (or events leading up to it) had the slightest effect on the award that he rendered.  A judge's decisions are not voidable on the basis of an undisclosed criminal conviction, even in a capital case, if the conviction had no impact on the decision, and we do not see why a stricter rule should apply in arbitration, especially since the standard due process entitlement to an impartial tribunal is relaxed when the tribunal is an arbitral tribunal rather than a court.

*Id.* (citations omitted).  The Court noted that "[a] contrary rule would encourage losing parties to an arbitration to conduct a background check on the arbitrators, looking for dirt — a particularly questionable undertaking because arbitrators, unlike judges, are not subjected to background checks when appointed.  It is another example of the lesser formality, and concomitant relaxation of due process norms, of arbitration in comparison to adjudication."  *Id.* at 713.

Applying that approach here, the Court concludes that neither Bronner's legal troubles nor his failure to disclose those legal troubles warrants vacatur.[5]   The Kleins argue that Bronner's indictment and conviction were "directly related" to the arbitration because they pertained to his "'substantial experience in the diamond industry,' which was the basis of his qualification as an arbitrator under the parties' agreements."  (Kleins' Opp'n 32).  But that argument is no different from the categorical materiality argument that Judge Posner found wanting in *United Transportation Union*.  *See* 284 F.3d at 712.  Moreover, it rings somewhat hollow given that the parties did not explicitly call for Bronner to disclose anything about his criminal record in the initial notice of appointment.  *See, e.g.*, *Lagstein*, 607 F.3d at 646 ("If [the party seeking vacatur] desired additional information about the arbitrators' backgrounds, it was free to seek that information by its own efforts.").[6]   The Kleins also assert that the criminal

---

[5]     The Kleins rely heavily on *Velez Org. v. J.C. Contracting Corp*., 734 N.Y.S. 2d 164 (App. Div. 2001), in which a New York court vacated an award after an arbitrator was convicted of an unrelated felony, to argue that Bronner's undisclosed conviction is grounds for automatic vacatur.  (Kleins' Opp'n 31).  But *Velez* was decided under New York law, not federal law. Additionally, the Court provided little analysis or explanation for its holding, and there is some reason to believe that it turned on the convicted arbitrator's having affirmatively lied about his conviction on a pre-arbitration questionnaire.  (Geltner Decl. ¶ 3 (discussing the American Arbitration Association questionnaire in *Velez*, which asked potential arbitrators whether they had been charged or convicted of any crime)).  Here, as noted, the notice of appointment did not explicitly call on Bronner to disclose the pending charges.  For these reasons, the Court declines to follow *Velez* and adopts Judge Posner's reasoning in *United Transportation Union*.

[6]     The Kleins suggest that Bronner should have disclosed the pending indictment because the initial notice of appointment instructed him as follows: "[I]f you are aware of any other information that may lead to a justifiable doubt as to your impartiality or independence or create an appearance of partiality, then describe the nature of the potential conflict(s)."  (Kleins' Opp'n 10 (quoting Leviev Aff. Ex. 20)).  As *United Transportation Union* makes clear, however, pending criminal charges do not necessarily qualify as such "information."  The Kleins also take issue with an affidavit that Bronner filed in New York state court in which he touted his "reputation as an honest and decent man" in the diamond industry, but failed to disclose the pending indictment.  (Kleins' Opp'n 10-11).  Admittedly, Bronner's affidavit was somewhat economical with the truth, but that does not mean that it was "fraudulent," as the Kleins assert (*id.* at 10), let alone that it would justify vacatur of the panel's arbitration award.

charges related to "Bronner's concealed business partnerships" with Zahavi and Leviev because they involved fraudulent shipments of diamonds to Brilliant Crystal.  (Kleins' Opp'n 17, 32-33). As discussed above, however, the cognizable evidence in the record does not substantiate the Kleins' assertions about the nature and extent of Bronner's ties to Zahavi, let alone to Leviev.  In short, although it would have been far better for Bronner to provide a full and timely disclosure of his legal troubles (if only to avoid litigation of this kind), neither those troubles in themselves nor his failure to disclose them rises to the level that would require vacatur on the grounds of either evident partiality or corruption.  As the Second Circuit has put it, "the better course is not necessarily the only permissible one." *Scandinavian Reins. Co.*, 668 F.3d at 78.

Finally, the Kleins assert that the panel's final award in itself "makes Bronner's bias manifest."  (Kleins' Opp'n 18).  The Second Circuit, however, has "repeatedly said that adverse rulings alone rarely evidence partiality, whether those adverse rulings are made by arbitrators, or by judges." *Scandinavian Reins. Co*., 668 F.3dat 75 (citations omitted).  That is, "the fact that one party loses at arbitration does not, without more, tend to prove that an arbitrator's failure to disclose some perhaps disclosable information should be interpreted as showing bias against the losing party." *Id.*; *see also, e.g.*, *Sebbag v. Shearson Lehman Bros.*, No. 89-CV-5477 (MJL), 1991 WL 12431, at *3 (S.D.N.Y. Jan. 8, 1991) (rejecting an argument that an award should be vacated due to its size because "[p]etitioner ha[d] not offered adequate support for his argument that the arbitrators were partial to the respondents").  In any event, the total award of $179 million (the $67 million that the Kleins had previously paid, plus the approximately $112 million awarded by the panel (Klein Decl. ¶ 24)) can hardly be described "unfair[], lawless[], and irrational[]," as the Kleins suggest, given that they were willing to agree to a buyout for $177 million in 2013.  (Kleins' Opp'n 36; Levine Decl. ¶¶ 60, 66).

### 3.   The Kleins' Remaining Arguments

In the alternative, the Kleins argue that the panel exceeded its powers and acted in manifest disregard of the law when it rendered the award.  *See* 9 U.S.C. § 10(a)(4); *Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 265 (2d Cir. 1989).  An award should be vacated for manifest disregard of the law where "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case."  *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004).  As noted above, when a court reviews an arbitration award for manifest disregard of the law, such review "is highly deferential to the arbitrators, and relief on such a claim is therefore rare."  *STMicroelectronics*, 648 F.3d at 78 (internal quotation marks omitted).  "The arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case."  *D.H. Blair & Co.*, 462 F.3d at 110 (internal quotation marks omitted).  Significantly, "mere demonstration that an arbitration panel made the wrong call on the law does not show manifest disregard; the award should be enforced if there is a *barely colorable justification* for the outcome reached."  *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 407 (2d Cir. 2009) (internal quotation marks and alteration omitted).

The Kleins contend that the panel exceeded its powers and acted in manifest disregard of the law when it imposed personal liability on them individually and when it awarded $70 million with respect to KLG and Sunrise.  (Kleins' Opp'n 37-39).  "Where an arbitration clause is broad," however, "arbitrators have the discretion to order remedies they determine appropriate, so long as they do not exceed the power granted to them by the contract itself."  *Banco de Seguros del Estado v. Mut. Marine Office, Inc.,* 344 F.3d 255, 262 (2d Cir. 2003).  In this case,

the scope of the panel's authority was broad, reaching "[a]ny controversy or claim arising out of or relating to" the agreements.  (Leviev Aff. Ex. 2 § 8.8; Ex. 5 § 11.11; Ex. 10 § 11.14; Ex. 18).  And while the individual Kleins themselves (namely, Martin Klein, Abraham David Klein, Moishe Klein, and Malka Klein) were not signatories to the KLG and Sunrise agreements, they were signatories to the JKD agreement and allowed the arbitrators to decide all three disputes in tandem.  (Leviev Aff. Ex. 2 at 17; Ex. 16 ¶ 13).  Moreover, the JKD Rights Agreement required the various Klein family members to "promptly comply with any instructions" regarding the buyout provisions (Leviev Aff. Ex. 2 §§ 2.2.1, 2.4), and the panel had a basis to extend those provisions to the KLG and Sunrise agreements because, as Martin Klein acknowledged, the same buyout valuation procedures were extended to each of the various agreements and because all the agreements were being arbitrated together.  (Leviev Reply Aff. Ex. 3, at 1728-29).

On top of that, the Klein family members explicitly invoked their ability to buy out LGC's interests in all three companies.  (Leviev Aff. Ex. 42, at 22-23 (detailing several of these instances)).  *See, e.g.*, *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.,* No. 97-CV-7102 (LAK), 1998 WL 314767, at *3 (S.D.N.Y. June 15, 1998) ("[A] nonsignatory to an agreement containing an arbitration clause may be compelled to arbitrate with a signatory where the nonsignatory knowingly accepts benefits derived directly from the agreement.").  And the Kleins "participated voluntarily and actively in the arbitration process" for all three agreements and, in doing so, waived any right to object to the imposition of personal liability.  *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1103 (2d Cir. 1991); *see Halley Optical Corp. v. Jagar Int'l Mktg. Corp.*, 752 F. Supp. 638, 639-40 (S.D.N.Y. 1990) (finding waiver where a party participated in proceedings, lest the party "participate in an arbitration, with the assurance that if it loses it may later challenge whether it had ever agreed to arbitration").  For example, the Kleins explicitly

agreed to arbitrate all three disputes together after LGC's amended Statement of Claim alleged that it was "entitled to redeem its interests in JKD LLC, KLG and Sunrise" and that damages should be awarded "jointly and severally."  (Leviev Aff. Ex. 15 ¶¶ 62, 75-76, 169-70; Ex. 16 ¶ 13).  In the same vein, the Kleins' response pleading both listed each of the individual Kleins as respondents and acknowledged that the three disputes — including those concerning KLG and Sunrise — were within the panel's purview.  (Leviev Aff. Ex. 15 ¶ 1; Ex. 16 ¶¶ 1, 13).

In fact, the Kleins waited until after the arbitration hearing was over to first object to the imposition of personal liability (or to the prospect thereof).  (Leviev Aff. Ex. 43, at 22-23).  It is well settled that "[f]ailing to maintain an objection to the arbitrator's jurisdiction throughout arbitration . . .  and participating beyond disputing arbitrability, such as engaging in discovery, testifying, and submitting papers on the merits of the underlying dispute, may evidence waiver." *iPayment, Inc. v. 1st Americard, Inc.*, No. 15-CV-1904 (AT), 2016 WL 1544736, at \*4 (S.D.N.Y. Mar. 25, 2016).  *Compare Merrill Lynch & Co. v. Optibase, Ltd.,* No. 3-CV-4191 (LTS), 2003 WL 21507322, at \*3 (S.D.N.Y. June 30, 2003) (finding waiver where a party "affirmatively sought adjudication of the merits of [the] claims in the arbitral forum"), *with Dedon GmbH v. Janus et Cie,* No. 10-CV-4541 (CM), 2010 WL 4227309, at \*7 (S.D.N.Y. Oct. 19, 2010) (finding no waiver where a party contested arbitrability "[f]rom its first submission . . . to its last").  It follows that the panel's decision to extend liability to the Kleins individually cannot be second guessed.  *See, e.g.*, *Gvozdenovic*, 933 F.2d at 1103 (finding intent for a non-signatory to arbitrate where the party made no objections to the arbitration proceeding, participated in the arbitration, and failed to seek judicial intervention to halt the arbitration).

*In re Arbitration Between Promotora de Navegacion, S.A. and Sea Containers Ltd.*, 131 F. Supp. 2d 412 (S.D.N.Y. 2000) ("*Promotora*"), upon which the Kleins rely (Kleins' Opp'n 37),

only confirms that conclusion.  The award in *Promotora*, unlike the award at issue here, was "unclear as to the parties against whom the damages [we]re awarded."  *Id.* at 415.  Thus, the *Promotora* Court was not confronted, as this Court is, with an arbitration panel's explicit decision to hold a non-signatory liable in an arbitration.  Additionally, the Court there ultimately found that the arbitrators had erred in imposing liability on a specific company because the company was "clearly . . . *not* a signatory to the only contract underlying the dispute at issue"; nobody representing the company had signed any pleadings or documents in the case; the company's liability was "never submitted, briefed, or argued to the panel"; and the company's lack of participation in the arbitration meant that its motion to vacate was not "a second bite at the apple."  *Id.* at 415, 417, 421.  That is a far cry from this case because, as discussed above, the Kleins actively participated in the arbitration with respect to all three agreements, derived benefits under all three agreements, and — for all intents and purposes — explicitly consented to a decision holding them personally liable.  To allow them to challenge the award because the panel took them up on that would indeed be a second bite at the apple.

Nor, finally, is there a basis to disturb the award because the panel awarded LGC $70 million with respect to KLG and Sunrise.  (Kleins' Opp'n 38-39).  To be sure, the KLG and Sunrise agreements explicitly provided only for dissolution, not a buyout.  (Klein Decl. Exs. 15-16).  But fashioning a buyout — instead of a dissolution — for KLG and Sunrise was within the scope of the arbitrators' authority to decide "[a]ny controversy or claim arising out of or relating to" their agreements.  (Leviev Aff. Ex. 2 § 8.8; Ex. 5 § 11.11; Ex. 10 § 11.14; Ex. 18).  Indeed, when the parties submitted the KLG and Sunrise disagreements to the panel, they empowered the panel to decide how to resolve the disputes.  And because Martin Klein explicitly agreed to the buyout procedure that valued all three ventures together, the panel cannot be said to have acted

outside its powers by crediting his testimony and abiding by the parties' preferred separation method.  (Leviev Aff. Ex. 13 ¶ 1; Leviev Reply Aff. Ex. 3, at 1728-29).  In any event, the Kleins cite no authority for their claim that mandating a buyout exceeded the panel's powers, let alone that the decision was devoid of "a barely colorable justification."  *Kolel,* 729 F.3d at 103-04.

## CONCLUSION

For the reasons stated above, LGC's petition to confirm the arbitration award is GRANTED, and the Kleins' motions to remand the state case, to dismiss the federal case, and to vacate the award are DENIED.  To reach that result is not to say that the conduct of the arbitrators (or the parties) in this case was exemplary.  As noted above, for example, the Kleins' allegations regarding Bronner — with respect to his criminal conviction, his relationships with LGC and its appointed arbitrator, and his less-than-entirely forthcoming disclosures about it all — are troubling, and the Court might well not have reached the same conclusions if it were deciding the matter *de novo* or in the first instance.  In light of the substantial deference owed to the arbitrators, the Kleins' own conduct throughout the arbitration proceedings, and the lack of cognizable evidence supporting vacatur, however, the award must be confirmed.

SO ORDERED.

Date:  February 16, 2017
       New York, New York

_____
JESSE M. FURMAN
United States District Judge